# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**MICHAEL PANDO; and**
**WILLIAM McMULLEN,**

      **Plaintiff,**

**v.**                                      **Case No: 5:15-cv-610-Oc-34-PRL**

**SHERIFF CHRIS BLAIR, in his official**
**Capacity as Sheriff of Marion County;**
**TANYA RODRIGUEZ, individually;**
**and FELIX RODRIGUEZ, individually,**

      **Defendants.**

_____

## REPORT AND RECOMMENDATION[1]

"Scooby Snax," if one needed such a substance, could be purchased in April 2013 (along with bongs and rolling paper) from the Holy Smokes Man, a store in Marion County owned by Plaintiffs Michael Pando and William McMullen. At that time, Deputy Tanya Rodriguez made such a purchase as part of a drug investigation she was conducting with Deputy Felix Rodriguez (and other drug agents) into Plaintiffs for selling synthetic marijuana. The investigation resulted in a seizure of items, a subsequent search warrant and the arrests of Plaintiffs, the suppression of evidence and the dismissal of charges, and ultimately this lawsuit against both Deputies (in their individual capacities) and the Sheriff of Marion County (in his official capacity).

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. See Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1.

Upon referral, this civil rights case, brought under 42 U.S.C. § 1983, is before me on the parties' cross motions for summary judgment. Plaintiffs have filed a motion for partial summary judgment with regard to Count I of the complaint against T. Rodriguez. (Doc. 31). Meanwhile, the three Defendants have moved for summary judgment in their favor as well. (Doc. 37 & 47). Plaintiffs have also filed a consolidated response (Doc. 53), and the Sheriff has filed a reply. (Doc. 64). I held a hearing on the motions on August 8, 2017.

As explained below, because Deputy T. Rodriguez is entitled to qualified immunity, and the claims against Deputy F. Rodriguez have been abandoned, and because there is no basis for liability against the Sheriff, I submit that the Defendants are entitled to judgment as a matter of law. Accordingly, I recommend that Defendants' motions for summary judgment be granted in all respects and the Plaintiffs' motion be denied.

## I.     BACKGROUND

This case involves Plaintiffs' novelty smoke shop business, known as "Holy Smokes Man." Although Plaintiffs contend their store legally sold incense, they found themselves under investigation in 2013 by agents of the Marion County Sheriff's Office who suspected Plaintiffs were actually dealing in "synthetic marijuana." As described by Plaintiff Michael Pando, synthetic marijuana is Damiana or marshmallow leaf plant material that is coated with a chemical element, "and it just varied on whatever was legal at the time." (Doc. 54-1, p. 45). Apparently, Plaintiffs and their supplier attempted to stay one step ahead of the law by varying the use of chemicals in their products depending on the various state or federal guidelines "for what was banned and what wasn't banned." (Doc. 54-1, p. 45). Meanwhile, Florida Attorney General Pam Bondi, the Florida Legislature, and law enforcement were attempting to regulate the ever-changing synthetic substances that were deemed to be a "significant threat to health and safety." (Doc. 40-2, ¶ 17). And

so the incidents giving rise to Plaintiffs' complaint occurred between April and September 2013, a time when both the law and law enforcement tools were quickly evolving to address the sale of synthetic marijuana and similar synthetic substances.

## A. Regulation of Synthetic Marijuana

A helpful place to begin is with the relevant regulatory framework in Florida regarding synthetic marijuana. Fla. Stat. § 893.03 defines certain enumerated substances as "controlled substances." As such, they are subject to regulation including, in many cases, prohibitions on possession or sale. (Doc. 40-2, ¶ 5, Fla. Stat § 893.03). Beginning at least in 2010, agents of the Marion County Sheriff's Office, including Deputy Tanya Rodriguez,[2] were aware of a class of synthetic drugs and synthetic cannabinoids that were sold and marketed in Florida, commonly known as "K2," or "Spice," or "synthetic marijuana."[3] (Doc. 40-2, ¶ 6). Rodriguez learned that synthetic marijuana was commonly sold at head shops, smoke shops, and convenience stores in small packages and marketed as incense, and was increasingly popular among teens and young adults. (Doc. 40-2, ¶ 6). Rodriguez was aware that these products consist of plant material that has been coated with chemicals to mimic THC, the active ingredient in marijuana. (Doc. 40-2, ¶ 7). Rodriguez also was aware that manufacturers of these "designer drug" products attempt to elude drug scheduling bans by modifying the substance with a newer version of a chemical that is not prohibited. (Doc. 40-2, ¶ 7).

On December 11, 2012, Florida Attorney General Pam Bondi issued emergency order 2ER12-1 certifying that there was an immediate need to place certain psychoactive substances

---

[2] Individual defendant Tanya Rodriguez is also frequently referenced in the record by her former name, Tanya Rightsell. On May 27, 2014, she married Defendant Felix Rodriguez, and is now known as Tanya Rodriguez. (Doc. 40-2, ¶ 1).

[3] In the record, the substance known as "synthetic marijuana" is also frequently referred to as "K2," "Spice," and "synthetic cannabinoids." In most instances herein, the undersigned will refer to these substances as "synthetic marijuana."

considered synthetic cannabinoids under Schedule I of Fla. Stat. § 893.03. (Doc. 40-2, ¶ 10). As a result of this emergency order, a number of chemical compounds, including XLR11, were added to Schedule I. (Doc. 40-2, ¶ 10, Doc. 41-1).

On October 9, 2013, Florida Attorney General Pam Bondi issued emergency order 2ER13-1. (Doc. 40-2, ¶ 40). This order added a substance known as "AB-Fubinaca" as a schedule I controlled substance. (Doc. 40-2, ¶ 40).

To address the fact that new chemical substances can be created more rapidly than they can be identified and controlled by action of the Legislature, the Florida Statutes also include a section regarding "controlled substance analogs." Fla. Stat. § 893.0356 addresses these substances, recognizing that they are

> designed to produce a desired pharmacological effect and to evade the controlling statutory provisions. Controlled substance analogs are being manufactured, distributed, possessed, and used as substitutes for controlled substances.

Fla. Stat. § 893.0356. Under § 893.0356, controlled substance analogs can be treated as controlled substances in Schedule I of § 893.03. As part of Rodriguez's training and education regarding synthetic drugs, she learned about controlled substance analogs, and that they shall be treated as controlled substances under § 893.03. (Doc. 40-2, ¶ 11).

**B. April 23, 2013 Seizure at Holy Smokes Man**

On April 23, 2013, Deputy Tanya Rodriguez traveled to Plaintiffs' "Holy Smokes Man" store in plain clothes. (Doc. 1, ¶ 14, Affidavit of Tanya Rodriguez, Doc. 40-2, ¶ 18). Rodriguez later testified that this was her first synthetic marijuana investigation. (Doc. 57-1, p. 35). Previously, Rodriguez had a variety of training, education and experience regarding controlled substances, including synthetic marijuana. (Doc. 40-2, ¶¶ 3-15). Rodriguez had also received a number of citizen complaints and a report from a deputy sheriff regarding the sale of synthetic marijuana at

Holy Smokes Man. (Doc. 40-2, ¶ 16). And, in February 2013, Deputy Rodriguez learned of another lab from which her law enforcement colleagues recovered large amounts of items consistent with the manufacturing of synthetic marijuana. (Doc. 40-2, ¶ 13). Rodriguez observed photographs and was briefed regarding items recovered from that investigation, including a cement mixer, green leafy plant material, and bottles of different flavored liquids and a variety of empty packages of synthetic marijuana to include packages labeled "Skooby Snax." (Doc. 40-2, ¶ 13).

Before entering Plaintiffs' business, Rodriguez observed several people entering and exiting the store with packages of what she believed to be synthetic marijuana, or "K2" or "Spice." (Doc. 40-2, ¶ 18). Deputy Rodriguez described her visit:

> I entered the business wearing plain clothes and remained in an area of the business where members of the public and customers are invited to enter. While I was in the area open to the public inside Holy Smokes Man, I observed several packages commonly referred to as synthetic marijuana, K2 or Spice in plain view that were hanging in a display behind the counter. In my experience as a drug enforcement agent, the packages that I observed for sale commonly contain controlled substances such as synthetic marijuana or synthetic cannabinoids.

(Doc. 40-2, ¶ 18). She also observed other merchandise for sale. For example, she observed glass pipes known as "bongs," that are commonly used to smoke banned substances, including marijuana and synthetic marijuana. (Doc. 40-2, ¶ 19). Rodriguez further explained that she observed a customer purchase "cheap rolling papers," although there was no loose tobacco for sale, and she noticed that the store offered "hidden compartment containers commonly used to hide illegal narcotics and contraband and commonly referred to as 'stash cans.'" (Doc. 40-2, ¶¶ 20, 21). She also observed a customer return to the store with an open package that he had just purchased containing a green leafy substance. (Doc. 40-2, ¶ 22). Rodriguez purchased a package of suspected synthetic marijuana labeled "Scooby Snax." (Doc. 40-2, ¶ 23). Rodriguez later explained that she specifically asked for the brand "Scooby Snax" because of her knowledge regarding the prior

investigation: "another agent from my office had previously worked an investigation a couple of months back," and recovered "several hundred pounds of synthetic marijuana," including "packages of Scooby Snax, Watermelon Scooby Snax." (Doc. 57-1, p. 20).

After leaving the store, Rodriguez verified that the owner of the Holy Smokes Man store had previously signed a written statement acknowledging "that he received the Attorney General report banning the purchase, sale, possession and distribution of K2/Spice and acknowledging that it was considered a Schedule I drug and that such action could lead to a felony arrest." (Doc. 40-2, ¶ 23). Later, joined by Deputy Felix Rodriguez, T. Rodriguez again went inside the store, and the agents identified themselves as law enforcement. (Doc. 40-2, ¶ 24). Plaintiff Pando invited the agents into an office to talk. (Doc. 40-2, ¶ 24). Meanwhile, T. Rodriguez noticed that "the K2 or Spice products were stored in Ziploc bags underneath the counter with different types of K2 inside," and that the bags were sold for between $9 and $18 per package, prices that were much greater than would be expected for incense for a legitimate purpose. (Doc. 40-2, ¶¶ 26, 27). As depicted in a photo, the various individual packages were in large, clear plastic bags that were placed inside shallow, clear plastic bins. (Doc. 42-1). T. Rodriguez also noticed that some of the products inside the office were stored in a black plastic garbage bag, which she recognized in her experience as being a common manner of transporting controlled substances. (Doc. 40-2, ¶ 28).

While the agents were in his office, Pando produced a document from a chemical company identified as AI Biotech from Richmond, Virginia that he claimed reflected an analysis on the synthetic marijuana being sold in the store. (Doc. 40-2, ¶ 29). T. Rodriguez, however, discovered that some of the packages for sale in Plaintiffs' store were not listed on the document. (Doc. 40-2, ¶ 29). Further, T. Rodriguez noted that the document itself stated that the test samples could not be generalized to other or similar lots. (Doc. 40-2, ¶ 29). Because a presumptive field test for synthetic

cannabinoids was not yet available, T. Rodriguez then explained to Pando that they would be taking the products and sending samples to the Florida Department of Law Enforcement (FDLE) for further analysis. (Doc. 40-2, ¶ 30). T. Rodriguez also asked McMullen how the products were purchased from their supplier, whether by the individual packages or by the pound, and McMullen was not able to provide that information. (Doc. 40-2, ¶ 31). Pando was also not able to provide the name and contact number of their supplier. (Doc. 40-2, ¶ 25).[4]

Deputies Tanya Rodriguez and Felix Rodriguez seized 589 individual packages of suspected synthetic marijuana, many with colorful names such as "Bomb Marley," "Mr. Happy," and "Dead Man Walking." (Doc. 40-2, ¶ 33). In regard to the seizure, T. Rodriguez stated that, based on the totality of circumstances during the encounter at Plaintiffs' store on April 23, 2013, and based on her training an experience as a law enforcement officer and drug enforcement agent, she had probable cause to believe that the packages sold at the Holy Smokes Man store contained controlled substances, specifically synthetic marijuana. (Doc. 40-2, ¶ 32).

### C. September 5, 2013 Search and Seizure

Following the April 23, 2013 seizure, the Marion County Sheriff's office continued its investigation of Holy Smokes Man. A total of 15 samples were selected from the various seized packages and were sent to the FDLE for analysis. (Doc. 40-2, ¶ 35). The lab results found that 12 of the 15 samples contained the prohibited chemical XLR11, which is one of the chemicals that was added to the list of Schedule I controlled substances by the emergency order of Attorney General Pam Bondi on December 11, 2012. (Doc. 40-2, ¶ 35). Meanwhile, on May 1, 2013 and

---

[4] Although the above facts are undisputed, there is an apparent dispute regarding whether T. Rodriguez asked Plaintiffs for an inventory list of their products. In his deposition, Plaintiff Michael Pando testified that she did not ask for an inventory list, but Plaintiffs asked for an inventory list of what was being seized. (Doc. 54-1, p. 61).

July 11, 2013, anonymous complaints were made regarding the Holy Smokes Man store selling K2/Spice or "fake marijuana." (Doc. 40-2, ¶ 36 & 37).

On seven different dates during the summer of 2013, Deputy T. Rodriguez conducted controlled buys at Holy Smokes Man using a confidential source as part of an undercover investigation into synthetic marijuana sales. (Doc. 40-2, ¶ 38). Because a field test was not available for synthetic cannabinoids until sometime in August 2013, Rodriguez sent the packages obtained during the controlled buys to the FDLE for analysis. (Doc. 40-2, ¶ 39). Rodriguez received the test results for three of those controlled buys prior to September 4, 2013, and the results revealed no controlled substances in the packages. (Doc. 40-2, ¶ 39). The test results, however, revealed the presence of AB-Fubinaca, a synthetic cannabinoid that was not yet added as a controlled substance as of September 2013, but was later added as a Schedule I controlled substance by emergency order of the Florida Attorney General on October 9, 2013. (Doc. 40-2, ¶ 39). Rodriguez explained her conclusions regarding the test results:

> Based on my training and experience as a drug enforcement agent, I knew that AB-Fubinaca was a synthetic cannabinoid and I had probable cause to believe that AB-Febinaca was a controlled substance *analog* as defined by Florida Statute 893.0356. Therefore, the fact that the FDLE test results for some of the suspected packages of synthetic cannabinoids did not reveal the presence of a substance that was on the controlled substance list at that time did not dispel my conclusion that I had probable cause to believe that products being sold by Holy Smokes Man were either controlled substances or *controlled substance analogs*.

(Doc. 40-2, ¶ 40) (emphasis added).

Meanwhile, sometime in August 2013, a presumptive field test for the presence of synthetic cannabinoids became available to agents in the Sheriff's drug unit. (Doc. 40-2, ¶ 41). Deputy Felix Rodriguez was able to use a presumptive field test for packages obtained during controlled buys on August 28, 2013 and August 29, 2013. (Doc. 40-2, ¶ 41). The field test indicated the presence of a banned chemical in packages labeled "Fairly Legal" and "Mad Hatter" purchased during those

controlled buys. (Doc. 40-2, ¶ 41). Subsequent testing of those samples by the FDLE confirmed the presence of banned substance XLR11, although the results were not available until September 20, 2013 and October 11, 2013. (Doc. 40-2, ¶ 42).

On September 4, 2013, T. Rodriguez prepared an affidavit for a search warrant in order to search Holy Smokes Man. (Doc. 40-2, ¶ 43). In the affidavit, Rodriguez described the events of April 23, 2013 and her observations, as well as the fact that the packages recovered during that initial controlled buy were tested and found to contain XLR1, a Schedule I controlled substance. (Doc. 40-2, ¶ 43). Rodriguez also described the controlled buys on August 28 and 29, 2013 and the positive field test results, among other details to support probable cause. (Doc. 40-2, ¶ 43, Doc. 45-1).

As eventually came to light during criminal proceedings against Plaintiffs, Rodriguez intentionally omitted from her affidavit several details of the investigation. She failed to include that four of the five bags purchased on August 28, 2013, and two of the five bags bought on August 29, 2013 field tested negative for the presence of controlled substances. (Doc. 1-2). Rodriguez also failed to include in the affidavit the fact that the confidential source had made five previous purchases from Holy Smokes Man prior to the August 28, 2013 purchase. And, Rodriguez failed to include that a bag purchased on July 3, 2013 was sent to the FDLE and tested negative for the presence of a controlled substance. Although those test results were received prior to the application for the warrant, the negative test results were not included in the affidavit. (Doc. 1-2). Finally, Rodriguez failed to include details regarding purchases from Holy Smokes Man on July 9, 2013, July 26, 2013, August 7, 2013, and August 20, 2013. At the time of the application for the warrant, Rodriguez had not yet received any lab results regarding those purchases. (Doc. 1-2).

Also on September 4, 2013, Rodriguez prepared an affidavit for a warrant to arrest Michael Pando and an affidavit for a warrant to arrest William McMullen on the charges of unlawful possession and sale of a Schedule I controlled substance in violation of Fla. Stat. § 893.12. (Doc. 40-2, ¶ 44). A Circuit Judge for the Fifth Judicial Circuit in Marion County signed the search warrant to search Holy Smokes Man and the arrest warrants. (Doc. 40-2, ¶ 46).

In her affidavit for this case, Rodriguez explains that when she prepared the affidavits for the warrants to arrest Plaintiffs, she used her discretion as a law enforcement officer and did not charge them with possession of a controlled substance analog in violation of § 893.0356 because it was a more difficult charge to prove, and because she had sufficient probable cause to make an arrest based on the presence of the Schedule I controlled substance XLR11 in several of the seized and purchased packages of synthetic marijuana. (Doc. 40-2, ¶ 47).

On September 5, 2013, agents of the Unified Drug Enforcement Strike Team (UDEST), including Deputies Tanya Rodriguez and Felix Rodriguez, executed the search and arrest warrants at Holy Smokes Man. (Doc. 45-1, p. 42). Numerous packages of synthetic marijuana were seized, and Plaintiffs Pando and McMullen were taken into custody and arrested on the active felony warrants for unlawful possession of a Schedule I controlled substance. (Doc. 40-2, ¶ 48).

### D. State Court Proceedings

During the ensuing criminal proceedings in state court, Plaintiffs successfully moved to suppress the results of the April 23, 2013 warrantless search. By order entered August 1, 2014, a Circuit Judge granted the motion to suppress, citing T. Rodriguez's admission during the hearing that, at the time of the seizure, the agents "did not know if the bags of alleged synthetic cannabinoids contained any chemicals prohibited by statute." (Doc. 1-1, p. 3).

And later, by Order entered May 26, 2015, the Judge also granted Plaintiffs' motion to suppress regarding evidence recovered during the search of Holy Smokes Man on September 5, 2013. (Doc. 1-2). The court noted that when Deputy T. Rodriguez "applied for the search warrant, she failed to include several material aspects of the investigation," and her omissions were intentional. (Doc. 1-2, p. 5). The court noted that, "[a]pparently, the affiant was under the impression that she should only include those facts which tended to support probable cause." (Doc. 1-2, p. 5). The court noted that the omissions "clearly altered the circumstances under which the warrant was issued," and did not provide the issuing judge with the full picture of the circumstances, including that numerous purchases from Holy Smokes Man resulted in negative tests for controlled substances. (Doc. 1-2, p. 5). The court found that, "had the omitted material been included in the affidavit, there would not have been probable cause for the issuance of a search warrant," and therefore granted the motion to suppress. (Doc. 1-2, p. 6). According to Plaintiffs, shortly thereafter, the criminal charges against them were dismissed. (Doc. 53, p. 10).

On December 7, 2015, Plaintiffs initiated this action against the Sheriff of Marion County in his official capacity, and against Deputies Tanya Rodriguez and Felix Rodriguez, each individually. (Doc. 1).

## II.    LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court reviews "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008). The Court considers the "evidence and reasonable factual inferences drawn therefrom in a light most favorable to the non-moving party." *Id.* The moving party bears the initial burden of establishing

the nonexistence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant is successful on this score, the non-moving party must then come forward with sufficient evidence to establish the existence of the elements on which she will bear the burden of proof at trial. *Id.* at 322-23. The non-moving party may not simply rest on the pleadings, but must use evidence such as affidavits, depositions, answers to interrogatories, or admissions on file to show that there is a genuine issue of material fact that remains for trial. *Id.* at 324.

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.* The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents,* 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury ... when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir. 1996).

## III.    DISCUSSION

In the Complaint, Plaintiffs Michael Pando and William McMullen alleged the following claims: (1) a Fourth Amendment claim against Deputy T. Rodriguez for the purportedly unreasonable search and seizure that occurred on April 23, 2013 (Count I); (2) a separate Fourth Amendment claim against Deputy T. Rodriquez for the search and seizure pursuant to the search warrant executed on September 5, 2013 (Count II); (3) a claim for false arrest (Count III) and another for malicious prosecution (Count IV), both against Deputies T. Rodriguez and Felix Rodriguez; and (4) a claim for municipal liability against the Sheriff (Count V), as well as one for malicious prosecution (Count VI). (Doc. 1).

Plaintiffs have since abandoned their claims for false arrest (Count III) and malicious prosecution (Count IV & VI). (Doc. 53, p. 19). (Plaintiffs state that *Black v. Wigington*, 811 F.3d 1259 (11th Cir. 2016), "compels the Plaintiffs to abandon proceeding on the claims for false arrest and malicious prosecution."). Accordingly, because of Plaintiffs' concession, I submit that judgments are due to be recommended in favor of the Defendants on these Counts (including in favor of Defendant Felix Rodriguez in all respects since he was only named in Counts III and IV).[5]

### A. Qualified Immunity – Counts I and II

Section 1983 establishes a cause of action against state officials who violate constitutional rights while acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 49 (1988). Plaintiffs contend that Deputy Tanya Rodriguez seized the synthetic marijuana in their store in April and September 2013 without a warrant and without a lawful warrant and (as to both incidents) without probable cause in violation of the Fourth Amendment. Indeed, as to the warrantless search, they seek summary judgment in their favor. In response, Rodriguez asserts that no constitutional deprivation occurred because probable cause existed and that she is otherwise protected from liability by qualified immunity.[6] She seeks judgment in her favor as to both Counts I and II.

Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818,(1982). If qualified immunity is applicable,

---

[5] Granting Felix Rodriguez's motion for summary judgment in light of Plaintiffs' abandonment of the claims against him is proper as Plaintiffs have not otherwise sought his dismissal under Rule 41.
[6] Although the motion for summary judgment asserting qualified immunity is filed on behalf of both individual defendants (Tanya Rodriguez and Felix Rodriguez), Plaintiffs have abandoned their claims in Counts III, IV and VI. Accordingly, Plaintiffs have abandoned all claims against Felix Rodriguez (Counts III and IV), and so the Court's qualified immunity analysis will focus solely on the claims alleged against T. Rodriguez.

the official is not only immune from damages, but is immune from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). When considering a plaintiff's claims in light of qualified immunity, a court must consider "whether plaintiff's allegations, if true, establish a constitutional violation," *Hope v. Pelzer*, 536 U.S. 730, 736 (2002), and also "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739. The Supreme Court has explained that the standard of liability is so high that it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The "salient question" that a court must answer when making the inquiry into whether a right was clearly established is whether the state of the law at the time of the incident gave the officer "fair warning" that his alleged treatment of the plaintiff was unconstitutional. *Hope*, 536 U.S. at 741. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of the pre-existing law the unlawfulness must be apparent." *Id*. at 739. Law enforcement officers are not required–or expected–to predict the future of constitutional law. *Wilson v. Layne*, 526 U.S. 603, 617-18 (1999). Indeed, where courts or judges disagree on a constitutional question, "it is unfair to subject police to money damages for picking the losing side of the controversy." *Id*. Moreover, in the Eleventh Circuit the courts will appropriately accord "official conduct a presumption of legitimacy." *Gonzalez v. Reno*, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotation and citation omitted).

And, importantly, a question at the heart of Plaintiffs' claims in this case, and, likewise, at the heart of the individual Defendant's assertion of qualified immunity, is whether Deputy

Rodriguez had probable cause (or arguable probable cause) for the seizures on April 23, 2013 and September 5, 2013. "When the claim is that a search and seizure or arrest violated the Fourth Amendment, qualified immunity depends upon whether arguable probable cause existed." *Cottrell v. Caldwell*, 85 F.3d 1480, 1485 n.1 (11th Cir. 1996). "More specifically, the qualified immunity issue in such cases is not whether probable cause existed, but whether a reasonable officer possessing the information the defendant officer possessed could have believed it did." *Id.* In other words, "[a]rguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry." *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999). *See also Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir. 1997) ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.")

Thus, the Court shall now proceed through the qualified immunity analysis, noting that the first step of the inquiry overlaps with the merits of the Plaintiffs' claims. As such, resolution of the claims at this stage is appropriate if the Court determines that undisputed facts establish that Rodriguez had probable cause (or arguable probable cause) in each instance in conformance with the Fourth Amendment. I submit that she did.

### 1. *April 2013 Seizure*

It is undisputed that no warrant existed for the seizure that occurred on April 23, 2013. Pursuant to the Fourth Amendment, a warrant based on probable cause is usually required to search a place and seize evidence of a crime found there. One exception to the warrant requirement is the "plain-view" doctrine: "it is . . . well settled that objects such as weapons or contraband found in a public place may be seized by the police without a warrant." *Payton v. New York*, 445 U.S. 573,

586–87 (1980). That is, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Id.* Pursuant to the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant*." Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Rodriguez contends that she did not violate Plaintiffs' right to be free from an unreasonable search or seizure because the April 23, 2013 seizure falls within the "plain view doctrine." She contends that Plaintiffs did not have a reasonable expectation of privacy in the public areas of the Holy Smokes Man store, citing *Maryland v. Macon*, 472 U.S. 463, 469 (1985). Rodriguez argues that the agents' entry into the Holy Smokes Man store and their examination of the wares that were exposed to all who entered the store did not infringe on a legitimate expectation of privacy, and thus did not constitute a search within the meaning of the Fourth Amendment, citing *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 388 (6th Cir. 1987). And, as to the products that were seized, Rodriguez contends that they fell within the plain view doctrine.

Under the plain view doctrine, the warrantless seizure of an item is permissible where "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir.2006) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)); *see also United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir.2001) (explaining that an officer "may seize any contraband, including weapons, in plain view"). As explained below, the undersigned agrees that the undisputed facts show that the April 23, 2013 seizure of Plaintiffs' products satisfied both of these prongs.

First, Plaintiffs do not dispute that Defendants were lawfully present in the store, or that representative packages of each brand and flavor of the seized packages could be plainly viewed by the public and from Defendants' vantage point upon entering the store. Further, it is undisputed that, during the "knock-and-talk" encounter, Plaintiff Michael Pando greeted Defendants and invited them into an office located in the back of the store. (Pando Deposition, Doc. 54-1, p. 60). It is also undisputed that, from the vantage point of behind the counter, the packages of Plaintiffs' products were plainly visible, as the individual packages were stored in clear bags within clear containers beneath the counter. (Doc. 42-1). In her affidavit, Rodriguez specifically stated that she observed the products "stored in Ziplock bags underneath the counter with different types of K2 inside." (Doc. 40-2, ¶ 26).

On this issue, Plaintiffs argue that the seized materials were packaged in opaque, sealed individual packages, and that the plant material inside could not been seen without opening the packages themselves. (Doc. 53, p. 4). Plaintiffs also argue that, while they kept representative packages on display, the bulk of their supply was in plastic bins behind the sales counter, outside of view from the public. (Doc. 53, p. 4). Plaintiffs further argue that Rodriguez conceded that it is impossible to determine whether the products contained banned chemicals under Florida law just by looking at them. And, there is no dispute that presumptive field tests for synthetic marijuana were not yet available at the time of the April 23, 2013 seizure.

Plaintiffs' primary argument against the application of the plain view doctrine to the April 23, 2013 seizure is that Deputy T. Rodriguez had no definitive way of determining whether the products were illegal by examining the packaging or even the material inside. (See e.g., Doc. 1 ¶¶ 15, 18). Due to the unavailability of a field test, Plaintiffs contend that the incriminating nature of the products could not have been immediately apparent during the knock-and-talk.

In support of this position, Plaintiffs cite *State v. Nickel*, 836 N.W. 2d 405 (N.D. 2013). (Doc. 53, p. 13-14). In *Nickel*, the Supreme Court of North Dakota held that officers' warrantless seizure of the contents of a package of synthetic cannabinoids presented to a shipping outlet and the removal of it to the law enforcement center and to the state crime lab contravened the Fourth Amendment. *Id. Nickel*, however, is not only from a different jurisdiction, but is easily distinguished from the instant case because it involves the inspection of a single suspicious package at a shipping outlet with essentially no surrounding circumstances to support probable cause (or arguable probable cause). In contrast, the instant case involves numerous facts demonstrating that, under the totality of circumstances viewed from the standpoint of an objectively reasonable officer, probable cause (and at a minimum arguable probable cause) existed to believe Plaintiffs' products were contraband.

The second question under the plain view doctrine "merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation omitted) (internal quotation marks omitted). As the Eleventh Circuit has explained, "[f]or an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband." *United States v. Alim*, 256 Fed. Appx. 236, 238 (11th Cir. 2007) (finding that the incriminating character of counterfeit merchandise was immediately apparent in light of agent's experience and training and surrounding circumstances, which included visual observations of similar counterfeit merchandise); s*ee also Danner v. United States*, 2015 WL 251307 at *8 (N.D. Ala. 2015) (finding that the plain view doctrine applied, despite argument that the incriminating nature of seized pills was not immediately apparent, because common sense, surrounding circumstances, and the experience of the law enforcement officer supported the determination they

were contraband). Importantly, "[a] practical, nontechnical probability that incriminating evidence is involved is all that is required." *Texas*, 460 U.S. at 742.

Here, the Court is not persuaded by Plaintiffs' argument that Rodriguez lacked probable cause because there was no definitive way to tell whether the products were illegal by examining their packaging. This reasoning fails to acknowledge the totality of the circumstances and all the facts and information within Rodriguez's knowledge. As she explained in her affidavit, during the encounter at Holy Smokes Man on April 23, 2013, and based on the totality of the circumstances and her training and experience, Rodriguez felt she had probable cause to believe that the packages for sale contained controlled substances, specifically synthetic marijuana. (Doc. 40-2, ¶ 32). Indeed, the totality of the circumstances includes her own knowledge about prior synthetic marijuana investigations involving similar leafy green material and packages labeled "Scooby Snax," prior citizen complaints about the store, and reports from a deputy sheriff. The totality of circumstances also includes Rodriguez's own observations in the store and parking lot, the presence of paraphernalia for sale including glass pipes known as "bongs," rolling papers, and hidden compartment containers, Rodriguez's purchase of a package of "Scooby Snax," the pricing of Plaintiffs' products, Pando's reluctance to identify his supplier, and discrepancies regarding the chemical analysis report produced by Pando. And, as Rodriguez later testified, the Plaintiffs' reluctance to provide information about their supplier enhanced her suspicions that the products were illegitimate. (Doc. 57-1, p. 32).

The totality of circumstances also include what Rodriguez could see in plain view in both the public areas of the store and after she was invited into the back office, including the packages that were visible underneath the counter. (Doc. 42-1). In fact, a photo supporting Rodriguez's affidavit demonstrates that, from the vantage point of behind the counter, Plaintiffs' products were

plainly visible. (Doc. 42-1). The photo is consistent with Rodriguez's statement that she "observed the K2 or Spice products were stored in Ziplock bags underneath the counter with different types of K2 inside." (Doc. 42-1). Finally, Rodriguez had occasion to observe the labels of the packages themselves, with graphics and names such as "Fairly Legal," "Bomb Marley," "Mr. Happy," and "Cloud Nine," which are arguably suggestive of an illegitimate use. (Doc. 42-1). These facts support both probable cause, and a finding that the incriminating nature of the products in Plaintiffs' store was immediately apparent.

Also, a very similar argument to the one advanced by Plaintiffs was expressly rejected by the court in *United States v. Wright*, 324 Fed Appx. 800, 804 (11th Cir. 2009). In *Wright*, the Eleventh Circuit affirmed the district court's denial of a defendant's motion to suppress and found that the plain view doctrine applied to the seizure of Lortab pills, noting that the officers had prior training in identifying Lortab, the officers had already observed apparent narcotics in the same room, and the pills were packaged in a clear plastic sandwich bag instead of a prescription drug bottle. *Id*. Based on these facts, the court found that "the incriminating character of the pills was immediately apparent and a man of reasonable caution could find that the pink pills were contraband." *Id*. And, significantly, the court rejected the defendant's argument that the incriminating character of the pills was not immediately apparent because the officers could not verify that the tablets were contraband until they called a poison control center. *Id*.

Indeed, other cases have rejected the argument that the incriminating nature of seized contraband cannot be immediately apparent without definitive identification of the substance. In *Danner v. United States*, NO. 5:12-cv-08041-VEH-JHE, 2015 WL 251307, * 8 (N.D. Ala. 2015), the movant contended that his counsel was ineffective for failing to challenge the seizure of drug evidence, specifically numerous pills that did not appear to be valid prescriptions, based on a

violation of the plain view doctrine. The movant argued that the fact that an officer called poison control to determine the identity of the pills established that the incriminating nature of the pills was not immediately apparent. *Id*. The court disagreed, however, and reasoned that the call to poison control did "not negate the apparent incriminating nature of the pills as they were found." *Id*.

The same reasoning applies to the instant case. The fact that testing of Plaintiffs' products could confirm the presence of a controlled substance does not negate the apparent incriminating nature of the products as they were found. Nor does it negate Rodriguez's reasonable suspicions as a law enforcement officer, based upon all the surrounding circumstances, including her observations while in the Holy Smokes Man store, her interactions with Plaintiffs at the time, and her prior experience, education, and training.

Further, Eleventh Circuit precedent on the application of the plain view doctrine in the context of qualified immunity does not require that the officer know with certainty that the item is *definitely* contraband, as opposed to *appearing* to be contraband. For example, in *Fish v. Brown*, 838 F.3d 1153, 1167 (11th Cir. 2016), the Eleventh Circuit held that the plain view doctrine and qualified immunity applied where an officer was sued under § 1983 for seizure of firearms found in plain view in a plaintiff's bedroom. The officer was familiar with standard domestic violence injunctions and, upon observing a revolver hanging from a bedpost and other firearms, asked plaintiff, "you still got that injunction against you for the firearms?" *Id*. at 1160. The plaintiff defensively replied that the firearms were not his, but belonged to his son. *Id*. at 1160. Although the response didn't definitively determine the ownership of the firearms, based on the circumstances, including the defensive nature of the response, the Eleventh Circuit found that both the plain view doctrine and qualified immunity applied. *Id*. at 1167.

Indeed, Eleventh Circuit authority demonstrates that under the plain view doctrine, there is no requirement that an officer know with absolute certainty that a crime has been committed, rather the question is whether there is a reasonable ground to believe that it has been committed. *See United States v. Smith*, 459 F.3d 1292 (11th Cir. 2006). In *Smith*, the court considered whether the seizure of pornographic photographs of minor children was legitimately conducted under the plain view doctrine during a search for evidence of illicit drug activity. *Id.* at 1291. The defendant argued that the incriminating nature of the photographs could not have been immediately apparent because the age of the females depicted was uncertain, and there was no evidence that the officers knew whether defendant met the technical requirements and mens rea defined in 18 U.S.C. § 2256, the relevant criminal statute. *Id.* at 1292. The court reasoned that "probable cause is not based on knowledge of legal technicalities, but rather on whether there is a reasonable ground to believe that a crime has been committed." *Id.* Indeed, "[t]here is no rule of law which requires an officer to know with absolute certainty that all elements of a putative crime have been completed when he seizes an article which reasonably appears to be incriminating evidence." *Id.*, citing *United States v. Slocum*, 708 F.2d 578, 605 (11th Cir. 1983) (internal quotation marks omitted). The court also reasoned that it was not problematic that the officers did not look at each individual photo before seizing them, nor was it problematic that some of the photos turned out to be of adult women. *Id.*, citing *Slocum*, 708 F.2d at 606 (observing that requiring a seizing officer to examine individually each document within a file or bound volume would substantially increase the time required to conduct a search, and thereby aggravate the intrusiveness of the search). And, "the scope of the 'plain view' doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant." *Id.* at 1293.

Turning again to the instant case, I submit that the seizure on April 23, 2013 was permissible under the plain view doctrine because T. Rodriguez was lawfully located in the place from which the seized objects could be plainly viewed and had a lawful right of access to the objects. She observed the seized products in plain view when she entered the store and, as to the bulk of the supply located behind the counter, observed the products after she was invited to the office in the back of the store. Finally, the incriminating character of Plaintiffs' products was immediately apparent based the labels themselves and the totality of the circumstances known to Rodriguez.

And, contrary to Plaintiffs' argument, Felix Rodriguez's apparent concessions during cross-examination at the June 30, 2014 suppression hearing are insufficient to create an issue of fact regarding probable cause. Plaintiffs make much of the fact that, following detailed testimony about the events of the April 23, 2013 seizure, F. Rodriguez was asked leading questions on cross-examination and agreed that he had nothing more than "suspicions" about whether banned chemicals were present, and that those suspicions were insufficient to support a search warrant. (Doc. 57-1, p. 103).[7] First, Plaintiffs' characterization that F. Rodriguez testified that he did not believe he would have had sufficient probable cause does not accurately portray the testimony. When read in context, it is apparent that his answer is meant to concede that he had not tested the

---

[7] Following detailed testimony regarding the events of April 23, 2013, including his observations and experiences interacting with Plaintiffs, F. Rodriguez provided the following testimony on cross-examination:
A. We did ongoing purchases from the store --
Q. Exactly.
A. -- to identify that the items that were there were consistent -- all was tested positive.
Q. Exactly.
A. Correct.
Q. But on April 23rd, you had no reason to believe a banned chemical was anywhere in that building, other than your suspicions; isn't that true?
A. That's correct.
Q. And isn't it true that those suspicions would not support a search warrant?
A. Correct.
(Doc. 57-1, p. 103).

products that were seized and did not know with certainty what particular substance they contained, and therefore he had only a "suspicion" that they contained a controlled substance. (Doc. 57-1, p. 103).

Second, and more importantly, whether F. Rodriguez personally believed probable cause existed has no bearing on the abundance of undisputed facts detailed above that are sufficient as a matter of law to establish probable cause. Probable cause is a question of law reserved for the Court. Indeed, it has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court. *See Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878) (observing that whether facts alleged to show probable cause are true is a matter of fact, "but whether, supposing them to be true, they amount to a probable cause, is a question of law" (internal quotation marks omitted)); *accord Director Gen. of Railroads v. Kastenbaum*, 263 U.S. 25, 28 (1923) (observing that where facts are in dispute, court submits the question of probable cause to the jury, but "with instructions as to what facts will amount to probable cause if proved"). Here, there are no disputes as to the material facts relevant to the Court's probable cause analysis. And when F. Rodriguez's answers are viewed in the context of the entirety of his testimony and not read in isolation, it is apparent that his testimony is consistent with the undisputed facts that support probable cause. For example, his testimony directly supports the undisputed facts cited in T. Rodriguez's affidavit in numerous ways. Just a few examples include his testimony regarding the Crimestoppers tips, the presence of bongs and other paraphernalia in the Holy Smokes Man store, and similarities between Plaintiffs' products and products seized during a prior investigation, including "Scooby Snax" in particular. (Doc. 57-1, p.

16-20). As detailed above, these facts and others contributed to the totality of the circumstances known to T. Rodriguez prior to the seizure, and none of those facts are in dispute.[8]

As the Eleventh Circuit's decisions in *Fish* and *Smith* demonstrate, the plain view doctrine does not require the officer to know with absolute certainty that the seized items are actually contraband, as opposed to appearing to be contraband under the circumstances. Here, there were numerous other facts to justify T. Rodriguez's reasonable suspicions beyond the appearance of the packages themselves. Rodriguez did not need to know with certainty that each and every package of synthetic marijuana seized contained a Schedule I controlled substance. It is sufficient that she had a reasonable ground to believe that Plaintiffs had committed a crime. Having seen products that she reasonably believed contained a controlled substance, Rodriguez had probable cause to presume, without field testing each package, that there was contraband among the products offered for sale in Plaintiff's store, and that the seized products were either contraband themselves, a controlled substance analog as set forth in Fla. Stat. § 893.03, or other evidence of a crime. *See Smith*, 459 at 1293. Or alternatively, at a minimum T. Rodriguez had arguable probable cause for the seizure and is therefore entitled to qualified immunity. *See Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999) ("Arguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry.").[9]

---

[8] To be clear, Plaintiffs do dispute whether they were reluctant to provide information about their supplier and whether they were asked to provide an inventory, and Plaintiffs portray their demeanor as fully cooperative. (Doc. 53, p. 3). None of those facts, however, assuming they are at issue, are necessary to a probable cause determination. There are otherwise ample undisputed facts to support probable cause.

[9] As a side note, and to the extent it is relevant to the plain view doctrine, it is necessary to clarify the facts surrounding Plaintiffs' contention that "[o]ther products were stored in a black garbage bag, inside a safe in the Store's office. (Doc. 53, p. 4). During his deposition, Pando testified that some of the products were stored "inside a black garbage bag inside the safe," in his office. (Doc. 54-1, p. 62). He did not, however, state whether the safe was open or closed. Meanwhile, in her affidavit, Rodriguez stated that she observed a black plastic bag inside the office. (40-2, ¶ 28). She stated, "[i]n my experience as a drug enforcement agent, it is common for individuals trafficking in controlled substances to deliver or transport the substances in black garbage bags." (40-2, ¶ 28). Consistent with her affidavit, during the suppression hearing, she testified

## 2.  September 2013 Search Warrant

T. Rodriguez also seeks summary judgment and asserts qualified immunity as to Count II, which alleges a claim against her pursuant to § 1983 arising from the search and seizure that occurred on September 5, 2013 pursuant (as Plaintiffs allege) to an unlawful search warrant.[10] In response, Plaintiffs argue that Rodriguez's intentional omission of clearly material facts from her warrant affidavit precludes qualified immunity. (Doc. 53, p. 19). They also argue that the nature of the FDLE results from the April seizure were stale (as Rodriguez apparently conceded during the suppression hearing). (Doc. 53, p. 18, citing Doc. 58-1, pp. 24-25).

Generally, a search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The Supreme Court instructs that (1) "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

_____

that she saw a "big, black garbage bag" while in Pando's office, although she did not state whether it was in the safe. (Doc. 57-1, p. 30). And, importantly, it does not appear that the bag or its contents were actually seized. First, Plaintiffs do not specifically contend in their briefs that the contents of the black garbage bag were seized. Second, T. Rodriguez testified that she never learned what was in the big black bag, and that the items seized were those behind the counter. (Doc. 57-1, p. 58-59, 62). Indeed, the state court judge asked T. Rodriguez numerous questions to clarify this point during the suppression hearing. The judge asked whether the seized items were in a big bag, referencing the large garbage bag in Pando's office, and T. Rodriguez replied, "No. They were in individual bags underneath the counter." (Doc. 57-1, p. 59). T. Rodriguez explained that the seized items were in individual clear, gallon-sized bags underneath the counter. (Doc. 57-1, p. 60). And, when the state court judge asked "so all the stuff you seized was in those gallon bags," T. Rodriguez replied, "Correct." (Doc. 57-1, p. 62). In other words, there is no dispute of fact that all of the items seized were products located in plain sight.

[10] Notably, in addition to responding substantively to Defendant's motion, Plaintiffs argue that summary judgment should be denied as to T. Rodriguez on Count II because she doesn't argue she's entitled to it insofar as she fails to set out a separately titled analysis section on Count II. A plain review of the motion (which broadly, and without any limitation noted, seeks the entry of summary judgment in favor of defendants) and T. Rodriguez's affidavit, reveals that she provides facts to support both the search in April and the warrant and search in September. And under the section "Arrest Affidavits and Arrest Warrants" she specifically discusses the search warrant. (See Doc. 37). While a direct reference to *Franks v. Delaware*, 438 U.S. 154 (1978) may be lacking, the Defendant clearly makes an effort in the brief and affidavit to set forth facts to support probable cause – or rather, arguable probable cause. And, during oral argument at the hearing on August 8, 2017, counsel for T. Rodriguez advanced those arguments in support of the motion for summary judgment as to both Counts I and II.

included by the affiant in the warrant affidavit," and (2) "if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56. And if, at the hearing, the defendant establishes the allegation of perjury or reckless disregard by a preponderance of the evidence, and "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

Further, this rule also applies to material omissions from warrant affidavits. *See United States v. Martin*, 615 F.2d 318, 328–29 (5th Cir.1980).[11] A warrant affidavit violates the Fourth Amendment when it contains omissions "made intentionally or with a reckless disregard for the accuracy of the affidavit." *Id.* And, it "is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *Id; Haygood v. Johnson*, 70 F.3d 92, 95 (11th Cir. 1995) (an officer would not be entitled to qualified immunity when "the facts omitted ... were ... so clearly material that every reasonable law officer would have known that their omission would lead to a search in violation of federal law.").

However, omissions that are merely negligent or insignificant and immaterial, but not reckless, will not invalidate a warrant. *United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir.1995). Further, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause. *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir.1990). In *United States v. Haimowitz*, 706 F.2d 1549, 1557 (11th Cir.1983), for example, the Eleventh Circuit held that, where unsavory information relating to the background

---

[11] All cases from the former Fifth Circuit handed down by the close of business on September 30, 1981, are binding on the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

of an informant was omitted from an affidavit, the warrant was still valid, due in part to the "firsthand character" of the statements coupled with independent corroboration of the information. And, there is ample precedent in the Eleventh Circuit that even if an officer recklessly omits material facts from an affidavit, he may still be entitled to qualified immunity if actual probable cause or even arguable probable cause exists. *See Madiwale v. Savaiko,* 117 F.3d 1321, 1326-27 (11th Cir. 1997) ("[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."); *Daniels v. Bango*, 487 Fed. Appx 532, 539 (11th Cir. 2012) (considering whether arguable probable cause existed despite officer's reckless omission of material facts from affidavit in support of arrest warrant); s*ee also Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002) ("[T]he warrant is valid if, absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause.").

In this case, Plaintiffs argue (and the state court found) that Rodriguez intentionally omitted material facts regarding her investigation that would have provided a "far different picture of the evidence." (Doc. 1-2). Plaintiffs also argue that Rodriguez herself conceded that the evidence regarding products seized on April 23, 2013 was stale at the time she applied for the search warrant. (Doc. 53, p. 18). As Plaintiffs contend, that leaves only the results of the recently developed presumptive field tests for the August 28 and 29 controlled purchases to establish probable cause. (Doc. 53, p. 18). Plaintiffs further argue that full disclosure of the investigation would have revealed that the vast majority of products sold by the store following the raid were permitted by law. (Doc. 53, p. 18). Plaintiffs do not dispute, however, that at least one brand, "Fairly Legal," field tested positive for a controlled substance, and also later returned positive lab results for a controlled substance. (Doc. 52, p. 18).

A close review of Rodriguez's affidavit in support of the warrant reveals that it contains the following facts to support probable cause. The affidavit includes Rodriguez's background and history participating in narcotics investigations, including becoming familiar with the appearance of illicit drugs, including synthetic marijuana, and marijuana-like substances that are commonly sold under the label of "incense" or "potpourri" and are used for high-like effects when inhaled. (Doc. 45-1, p. 35). The affidavit includes details regarding a controlled purchase on April 29, 2013, including a "Mind Trip" package that later tested positive for XLR11, a Schedule I narcotic. (Doc. 45-1, p. 36). Also included are details of two anonymous "crime stoppers" tips reporting that Holy Smokes Man has been selling K2/Spice or "fake marijuana." (Doc. 45-1, p. 36). And the affidavit goes on to detail the events of April 23, 2013 leading up to and including the seizure, and the fact that 12 of the 14 samples tested by FDLE from that seizure were found to contain XLR11. (Doc. 45-1, p. 38).

Next, the affidavit includes details regarding the August 28, 2013 controlled buy of five packages of suspect synthetic marijuana, and the fact that Rodriguez conducted a presumptive field test of the "Fairly Legal" package, resulting in a positive result for the presence of a banned listed chemical. (Doc. 45-1, p. 39). And, it details a controlled buy on August 29, 2013 of five packages of synthetic marijuana, of which the "Fairly Legal" and "Mad Hatter" packages tested positive for the presence of a controlled substance. (Doc. 45-1, p. 40). Notably, Rodriguez did not include the details of all transactions that were part of her investigation into Holy Smokes Man. As she later explained, she omitted them because, "I included what I thought was pertinent to establish probable cause for my affidavit." (Doc. 57-8, p. 76).

As we know, during the criminal proceedings, the state court found that Rodriguez's omissions were intentional and material, and expressly found that the omissions would have made

the results of the presumptive field tests much more suspect, and "had the omitted material been included in the affidavit, there would not have been probable cause for the issuance of a search warrant." (Doc. 1-2, p. 6). On this basis, the court granted Plaintiffs' motion to suppress. (Doc. 1-2, p. 6). And, as Plaintiffs contend, the criminal charges against them were therefore dropped.[12]

Under the law of the Eleventh Circuit, even if T. Rodriguez recklessly omitted material facts from the affidavit in support of the arrest warrant, she may still be entitled to qualified immunity if there is otherwise arguable probable cause. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997) (holding that, despite officer's alleged misrepresentations and omission of material facts in the affidavit, qualified immunity applied because arguable probable cause existed). To make this determination, the Court considers whether "under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir.2004); *see also Grider v. City of Auburn*, 618 F.3d 1240, 1257 (11th Cir. 2010). And, once again, "[a]rguable probable cause, not the higher standard of actual probable cause, governs the qualified immunity inquiry." *Jones*, 174 F.3d at 1283 n.3.

Put another way, the critical question here, then, is whether the omissions of which Plaintiffs complain "were so clearly material that every reasonable law officer would have known that their omission would lead to a search [or seizure] in violation of federal law." *Madiwale,* 117 F.3d at 1327 (internal quotation marks and alteration omitted). To that end, putting aside Rodriguez's omissions, her affidavit did accurately provide a great deal of information about her investigation. And she accurately stated that presumptive field tests of packages obtained during controlled buys on August 28 and 29, 2013 indicated the presence of a controlled substance. (Doc. 40-2, ¶ 41). Specifically, Rodriguez included in the affidavit that the presumptive field test indicated

---

[12] The parties have not argued that this Court is bound in any way by the state court findings; indeed, at the hearing they conceded this Court is not.

the presence of a banned listed chemical in the packages labeled "Fairly Legal," and "Mad Hatter." (Doc. 40-2, ¶ 41). I submit that these results, coupled with the results from April 2013 showing positive findings in 12 of 14 items tested, are adequate to establish probable cause, or at a minimum, arguable probable cause.[13] *See Jones* 174 F.3d at 1283 n.3.

Rodriguez's statement regarding staleness does not render the results stale as a matter of law. There is not a time limit set by the law; rather courts consider the nature of the offense, the nature of the information, and the maturity of the information, among other factors. *See e.g., United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) ("When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate [judge], rather, we review each case based on the unique facts presented."); *United States v. Hooshmand*, 931 F.2d 725, 735–36 (11th Cir.1991) ("When the alleged criminal activity is ongoing, however, it is unlikely that the passage of time will dissipate probable cause."). Indeed, in the context of drug trafficking, the courts have recognized that such practices are generally protracted and continuous. *See United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985) (considering staleness of wiretap evidence regarding drug trafficking crime, and observing,"[w]hen criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause."). Plus, older information can be updated, such as here where additional evidence reveals the products – or at least some of them – tested positive on later controlled buys. *See Harris*, 20 F.3d at 450 (reasoning that "even stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material.").

---

[13] In her affidavit in support of the search warrant regarding the packages seized on April 23, 2013, Rodriguez stated,"[t]he [FDLE test] results revealed 12 of the 14 exhibits submitted contained XLR11, a schedule I controlled substance." (Doc. 45-1, p. 38).

Meanwhile, Rodriguez apparently omitted other information that revealed that not every item purchased from Holy Smokes Man tested positive for a listed controlled substance. For example, she omitted that a package of "LOL" obtained during a controlled buy on July 3, 2013 tested negative for a controlled substance, but positive for AB-Fubinaca. She omitted that information even though the FDLE lab results had been received prior to September 4, 2013, the day she signed the affidavit. And, she omitted the fact that controlled buys were made on July 9, July 26, August 7, and August 20, 2013, and that those FDLE test results had not yet been received. Finally, she omitted the fact that, during field tests performed on August 28 and 29, some of the packages field tested negative for a controlled substance.

Importantly, Rodriguez's omissions are best characterized as just that – omissions. Although, as the state court observed, the omitted information would have given the judge "a far different picture of the evidence" (Doc. 1-2, p. 5), the omitted information is not such that it actually negates or contradicts what is contained in the affidavit. In other words, the information that a package of "LOL" tested negative for a controlled substance does not negate the fact that several other packages tested positive. Nor does the fact that on August 28 and 29 some packages field tested negative contradict the fact that other packages, including "Fairly Legal," field tested positive for a controlled substance. Likewise, the fact that numerous test results had not yet been received does not negate the positive test results and other facts and observations outlined in the affidavit.

In consideration of all these facts, and upon review of the particular and unique nature of Rodriguez's omissions under the totality of the circumstances, the Court finds that Rodriguez nonetheless had probable cause (or at least arguable probable cause) that synthetic marijuana was being sold in Plaintiffs' store when she signed the warrant affidavit. At a minimum, she knew and included in the affidavit that certain packages obtained from Plaintiffs' store had yielded positive

results in FDLE testing for the controlled substance XLR11. Rodriguez had observed paraphernalia in Plaintiffs' store that was consistent with the use of contraband. And, importantly, she noted that multiple packages tested on August 28 and 29 yielded positive field test results for a controlled substance. These facts are sufficient to establish arguable probable cause, if not actual probable cause. *See Madiwale*, 117 F.3d at 1327 (finding arguable probable cause existed, despite officer's alleged misrepresentations and omissions in warrant affidavit, where affidavit otherwise set forth other evidence of crimes, such as sworn taped statements). And it cannot be said that Rodriguez omitted facts that "were so clearly material that every reasonable law officer would have known that their omission would lead to a search [or seizure] in violation of federal law." *Madiwale*, 117 F.3d at 1327 (internal quotation marks and alteration omitted). *See Smith v. Sheriff, Clay Co., Fla*., 506 Fed. Appx. 894, 899 (11th Cir. 2013) (holding that, despite omission of some facts, warrant provided probable cause and officer was entitled to qualified immunity).

Finally, the argument raised by counsel at the motion hearing – that the September seizure was overbroad and probable cause only existed to allow seizure of the particular branded products that had tested positive for controlled substances -- is unavailing. Not only does this argument defy common sense and assume consistency among Plaintiffs' packaging, but it is contrary to the Eleventh Circuit's holding in *United States v. Smith*. In *Smith*, the Court expressly permitted seizure of items that, "while not contraband themselves, may be used as evidence against a defendant." 459 F.3d at 1293. And here, likely for the same reasons, the warrant specifically contemplated and authorized seizure of both "synthetic marijuana" and "drug paraphernalia." (Doc. 45-1, p. 40). At a minimum, all of the products seized were either synthetic marijuana or drug paraphernalia, or other evidence that could be used against Plaintiffs to demonstrate that synthetic marijuana was being sold.

To paraphrase the words of the Eleventh Circuit in *Smith*, in a perfect world Rodriguez would have included all information regarding her investigation of Holy Smokes Man in the warrant affidavit. 506 Fed. Appx. at 900. But, as the Eleventh Circuit reminds us, "perfection is not the standard by which [the officer's] conduct is judged. Nor is negligence, for that matter." *Id., citing Madiwale*, 117 F.3d at 1327 (noting that the negligent omission of facts from an affidavit will not invalidate a warrant). Instead, qualified immunity applies to protect officers in all cases except those in which the conduct at issue was "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1318 (11th Cir.2003) (internal quotation marks omitted). Rodriguez's conduct in drafting her warrant affidavit was neither plainly incompetent nor a knowing violation of the law, and she is therefore shielded by qualified immunity. Accordingly, Rodriguez is entitled to summary judgment on Count II.

## B.  Municipal Liability – Count V

Finally, the Court turns to Plaintiffs' remaining claim, Count V alleging a claim for municipal liability the Sheriff of Marion County. Specifically, Plaintiffs allege that the Sheriff "instituted and followed practices, customs and policies which were the moving force behind the deprivation of Plaintiffs right to be free from unreasonable searches and seizures." (Doc. 1, ¶ 98). Plaintiffs also allege that, "by failing to discipline his deputy sheriffs for their actions and inactions, Sheriff Blair has ratified his deputies' decisions and the reasons for those decisions, thus constituting a practice, custom or policy." (Doc. 1, ¶ 98). Alternatively, Plaintiffs allege that Tanya Rodriguez and Felix Rodriguez were final policymakers for the Sheriff. (Doc. 1, ¶ 98). Also alternatively, Plaintiffs allege that the Sheriff failed to adequately train his agents and employees with respect to searches, seizures, and arrests. (Doc. 1, ¶ 98). The Sheriff has submitted a

comprehensive motion for summary judgment addressing each of the theories of liability alleged by Plaintiffs. (Doc. 47). The Sheriff's motion is due to be granted.

First and foremost, as explained above, Plaintiffs have failed to establish an underlying constitutional deprivation that would provide a basis for the Sheriff's liability. The Supreme Court has explained, "neither *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm." *Heller*, 475 U.S. at 799; *see also Rooney v. Watson*, 101 F.3d 1378 (11th Cir.1996) (unnecessary to review argument of failure to train by sheriff when deputy did not violate a constitutional right). Accordingly, Sheriff Blair is entitled to summary judgment on the basis that Tanya Rodriguez had probable cause for the searches and seizures in April and September 2013, and thus did not violate Plaintiffs' constitutional rights, as explained above.

Second, Plaintiffs have failed to present any evidence sufficient to establish a basis for the Sheriff's liability under the various alternative theories of municipal liability pled: (1) that the Sheriff's Office had policies or customs that were the moving force behind the violations of Plaintiffs' constitutional rights; (2) that the Sheriff had a policy of failing to adequately train employees regarding searches, seizures, and arrests; (3) that the Sheriff ratified the allegedly unlawful actions of the Defendant deputies by failing to discipline them, thus constituting a practice, custom or policy; and (4) that the deputies were the final policymakers for the Sheriff's Office as their decisions were not effectively reviewable. In support of their claims, Plaintiffs offer little more than speculation and innuendo. Their conclusory allegations and arguments related to a grand jury investigation and subsequent indictment of Sheriff Blair are insufficient to establish the pertinent

element – that the Sheriff had a custom, policy, or practice that was the moving force behind the searches at issue.

### 1. Facts Relevant to Municipal Liability

In support of his motion for summary judgment, the Sheriff has submitted voluminous evidence regarding the Sheriff's Office policies. For example, through the affidavit of Capt. James Pogue, the Research and Planning Director for the Marion County Sheriff's Office (Doc. 47-2) and the operations directives documents themselves (Doc. 47-2, pp. 3-51), the Sheriff has presented undisputed evidence regarding the Sheriff's Office policies. The Sheriff has also submitted the affidavit of Lt. David Redmond, Training Unit Director, regarding Sheriff's Office training practices and policies. (Doc. 47, Ex. 3).

For example, it is undisputed that the Sheriff's Office had the following Operations Directives in place: (1) O.D. 3352.00 – Complaints against Employees/Internal Investigation, regarding complaints and establishing internal investigations; (2) O.D. 3350.00 – Discipline Policy, regarding procedures for disciplining deputies; (3) O.D. 3500.00 – Training Programs, addressing in-service training for deputies, including "Legal issues"; (4) O.D. 4278 – Drafting and Approval of Search Warrant, providing direction regarding search warrants and probable cause; (5) O.D. 4280 – Execution of Search Warrants, regarding search warrant execution; (6) O.D. 4282 & 4280 – Warrantless Searches and Seizures, regarding exceptions to the warrant requirement, such as the plain view doctrine; and (7) O.D. 4320 – Illegal Drug and Vice Investigations, regarding UDEST, and outlining that it reports directly to the Special Investigations Bureau Chief.

In addition, the Sheriff has submitted the affidavit of Ryan Robbins, a lieutenant with the Marion County Sheriff's Office and the Commander of the High Intensity Drug Trafficking Area (The North Florida Initiative) with the Unified Drug Enforcement Strike Team (UDEST). (Doc.

47-1). Lt. Robbins explains that UDEST is a joint task force of voluntary cooperation between the City of Ocala, the Marion County Sheriff's Office, and the State Attorney's Office, and that it operates pursuant to a Special Voluntary Cooperation and Operational Assistance Agreement and the UDEST Unit Manual. (Doc. 47-1). The UDEST Operations Order covers numerous topics, including Search Warrants. (Doc. 47-1, p. 35-39).

And, Lt. Redmond, Training Unit Director for the Marion County Sheriff's Office, explains that deputies, including T. Rodriguez, receive substantial initial and ongoing training regarding the preparation of search and arrest warrants and probable cause, as well as ongoing training and instruction regarding constitutional law and the law surrounding the preparation and execution of search and arrest warrants. (Doc. 47-3, ¶ 5). Lt. Redmond further explains that deputies receive The Florida Law Enforcement Handbook, which covers probable cause and search and seizure. (Doc. 47-3, ¶ 5).

Meanwhile, the evidence presented by Plaintiffs on this topic amounts to little more than speculation and innuendo. Plaintiffs argue that Sheriff Blair's written policies pertaining to the supervision of UDEST agents were not actually followed, and that "the Sheriff's Office under Sheriff Blair's leadership, exhibited a culture of failing to supervise officers and lying to cover-up constitutional violations." (Doc. 53, p. 20). In support, Plaintiffs' cite the Presentment of the Grand Jury dated June 2, 2016, and an Indictment dated June 2, 2016 charging Sheriff Blair with perjury and official misconduct (Doc. 61-1). While these documents are concerning, neither document pertains directly to the facts of the instant case, or to other factually similar incidents. The Presentment of the Grand Jury, for example, pertains to the Grand Jury's conclusions that Sheriff Blair failed to ensure that written policies for employee evaluations, pursuits, use of force, and the reporting of excessive use of force were followed. (Doc. 61-1, p. 12). It does not address

deficiencies with respect to searches, warranted or otherwise. And, although the report contains a brief section regarding specialty units, the report's focus is on the Tactical Investigation Unit (TIU). The report mentions that the TIU was regarded as having "free rein." (Doc. 61-6, p. 6). Notably though, the supervision of UDEST agents is not addressed in the report.

Even putting aside the question of admissibility, this report has little to no relevance to Plaintiffs' claims and is insufficient to create an issue of fact. And, the Court agrees with the Sheriff that former Sheriff Blair's perjury indictment regarding an unrelated matter and which came after this incident is "[e]ven further afield in terms of relevance." Neither of these documents create any dispute regarding the Sheriff's Office policies related to search and arrest warrants that are pertinent to this case. They relate to issues principally involving the Tactical Investigation Unit and use of force, and perhaps they could call into question statements made by former Sheriff Blair, but those issues simply aren't the subject of this suit.

Plaintiffs also claim, without citing any support, that an unnamed Sheriffs' Office representative stated "that unit runs unchecked," regarding UDEST. (Doc. 52, p. 20). This argument appears to refer to Plaintiff Pando's deposition testimony that, during a meeting soon after the April 23, 2013 seizure, David Porter of the Sheriff's Office "was mortified and he said that unit runs unchecked, which is the same thing that the state Attorney's Office said." (Doc. 55-1, p. 46). These assertions are not proffered through an affidavit or declaration of the speaker themselves and are otherwise insufficient to create an issue of fact here. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). And, even if the hearsay statement could be reduced to admissible evidence at trial, for example through Porter's own testimony, the statement is still insufficient to create an

issue of fact regarding municipal liability. That the UDEST unit "runs unchecked" is nothing more than a vague statement with no apparent relevance to whether a persistent and widespread practice of alleged constitutional violations existed. There is no suggestion that Porter had supervisory authority over the UDEST unit or had personal knowledge about the unit, nor does the statement reference prior similar incidents. In fact, there is nothing about the statement to suggest that Porter meant UDEST ran "unchecked" in regards to search and seizure procedures, as opposed to other unspecified types of undesirable conduct.

### 2. *Plaintiffs' Arguments Regarding Municipal Liability*

Plaintiffs contend that a jury could infer from the above evidence that the UDEST unit was not subject to any meaningful supervision during their drug investigation. Plaintiffs also contend that the fact that Sheriff Blair was indicted for perjury could lead a reasonable jury to believe that policies governing UDEST were "nothing more than lip service to cover up for the actual customs and practices of the Office." (Doc. 53, p. 21). Plaintiff argues:

> taking the facts in light most favorable to the Plaintiffs, the custom or practice of the Sheriff's Office contradicted its written policies, and it was this custom/practice, in fact a culture of lack of supervision and condoned perjury by the very Sheriff himself, which caused the Rodríguezes to engage in the constitutional violations at issue. Put simply, the Rodríguezes were doing what the Sheriff condoned ("kicking asses and taking names") and Tanya Rodriguez was doing just as the Sheriff did (perjury via falsities in her warrant affidavit).

(Doc. 53, p. 21).

### a. Sheriff's Office Policies Claim

Plaintiff's first argue that the Sheriff's Office had policies or customs which were the moving force behind the violations of Plaintiffs' constitutional rights. There is no evidence, however, supporting that a persistent and widespread practice of the alleged violations exists. *See McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). For example, Plaintiffs have not

identified a single incident that they claim constitutes a similar prior violation. And, even assuming a violation occurred in this case, a single erroneous decision does not support an inference of a custom or policy. *See Wayne v. Jarvis*, 197 F.3d 1098, 1106 (11th Cir. 1999). To the contrary, the Sheriff has proffered undisputed evidence that numerous policies were in place, in the form of operations directives and other policies, that were designed to prevent constitutional violations.

b. Failure to Train Claim

Plaintiffs also contend that the Sheriff failed to adequately train "his agents and employees with respect to searches, seizures, and arrests, despite an obvious and apparent need for such training." (Doc. 1, ¶ 98). Simply put, nothing proffered by Plaintiffs is sufficient to create an issue of fact regarding the Sheriff's Office's training policies and practices. Those policies are outlined in the Sheriff's operations directives, and explained in the affidavit of Lt. Redmond. (Doc. 47-3). It is undisputed that the Marion County Sheriff's Office provides its deputies with relevant training regarding probable cause and search and seizure. (Doc. 47-3, ¶ 5).

A municipality may be liable for failing to train its employees if "such inadequate training can justifiably be said to represent 'city policy.' " *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390. "Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, . . . a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The failure to train must "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality." *Canton*, 489 U.S. at 389. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. Indeed, to

support a failure to train claim, there must be a prior pattern of similar constitutional violations by untrained employees that the Sheriff knew of but made a deliberate decision not to take any action. *Connick v. Thompson*, 563 U.S. 51, 61-62. (2011).

Plaintiffs have offered no such evidence in this case. In fact, Plaintiffs have proffered no evidence regarding the sufficiency of the Sheriff's Office training policies, nor have they proffered evidence regarding a pattern of similar constitutional violations by untrained employees. And, the Sheriff's Office policies and training activities belie Plaintiffs' claim of deliberate indifference. *Canton*, 489 U.S. at 388. Accordingly, Sheriff Blair is entitled to summary judgment on the failure to train claim.

### c. Ratification Claim

Plaintiff also alleges that the Sheriff tacitly authorized unconstitutional actions by ratifying them and otherwise failing to correct them, citing *St. Louis v. Praprotnik*, 485 U.S. 112, 127. In order to state a § 1983 claim against a municipality based on a ratification theory, a plaintiff must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis. *Sherrod v. Palm Beach Co. School Dist.*, 424 F. Supp. 2d 1341, 1346.

Plaintiffs argue that, despite being put on notice that Tanya Rodriguez and Felix Rodriguez had effectuated an unlawful seizure, the Sheriff "made no attempt to reign-in the activity of an investigation led by an agent who had never performed a synthetic marijuana investigation before, and committed a flagrant constitutional violation on her first attempt at doing so. For example, the Rodriguezes were not disciplined." (Doc. 53, p. 22).

First, Plaintiffs' argument fails because the evidence does not support that Defendants committed a "flagrant constitutional violation," as Plaintiffs argue. And, even so, a failure to

investigate a single incident is insufficient to establish ratification by a Sheriff, as such failure does not cause the violation. *See Salvato*, 790 F.3d at 1296, *Feliciano v. City of Miami Beach*, 847 F. Supp. 2d 1359, 1367 (S.D. Fla. 2012). Finally, it is worth noting that the Sheriff has not conceded that there was no Sheriff's Office Investigation regarding the incidents involving the Plaintiffs or that any discipline was warranted for the deputies actions. (Doc. 47, p. 16, n. 7). The Sheriff is entitled to summary judgment on the ratification claim.

### d. Failure to Discipline

Plaintiffs also argue that the Sheriff had a practice of failing to discipline his deputies, and that failure amounted to a custom or policy. Plaintiffs, however, have not offered evidence of any other similar violations, and isolated incidents are insufficient to establish a policy or custom. *See McQurter v. City of Atlanta*, 572 F. Supp. 1401, 1420 (N.D.Ga.1983) (isolated failure to discipline police officers was insufficient to establish a custom or widespread practice on behalf of the city). Even if disciplinary action is warranted against an officer in a particular case, if a Sheriff has not "persistently" failed to discipline officers a custom or policy is not established. *See Thompson v. Sheriff*, 542 Fed Appx. 826, 830 (11th Cir. 2013). As the Sheriff argues, "in the instant case, there is no evidence of other such prior, similar incidents constituting a widespread practice of the relevant alleged constitutional violations for which the Sheriff failed to investigate and discipline officers." (Doc. 47, p. 17). The Sheriff is entitled to summary judgment on the failure to discipline claim.

### e. Final Policymakers Claim

Finally, Plaintiffs alternatively allege that the Defendant deputies were "final policymakers" for the Sheriff's Office. They contend that the officers' decisions "were not immediately or effectively reviewable." (Doc. 1, ¶ 98).

No final policymaking authority exists, however, where the official decisions are subject to meaningful administrative review. *See Samarco v. Newmann*, 44 F. Supp. 2d 1276, 1286 (S. D. Fla. 1999). As the Sheriff argues, the review process for the deputies' actions is set forth in the documents governing UDEST and the Sheriff's operations directives. For example, O.D. 4278.20 provides guidelines for drafting search warrants, and provides that drafts of warrants are to be presented to an immediate supervisor for review and approval, and that the agency's General Counsel and/or the Assistant State Attorney may also review and provide input. (Doc. 47-2, p. 31). This process for review is also set forth in UDEST Operations Order No. 11, which details the process for preparing a warrant, including obtaining supervisor approval and submission of warrant to the appropriate prosecuting authority, such as the State Attorney or U.S. Attorney. (Doc. 47-1, p. 36).

Importantly, a policymaker does not delegate his authority to an employee by allowing the employee to exercise discretion, as that would be indistinguishable from respondeat superior liability. *Praprotnik*, 485 U.S. at 124-25. And in the instant case, as the Sheriff argues, he is the final policymaker for the Sheriff's Office. *See Samarco*, 44 F. Supp 2d at 1287 (reviewing Fla. Stat § 30.52 and relevant state law cases designating a county sheriff as an independent constitutional official and finding that, as the county's chief law enforcement officer, sheriff was the final policymaker for matters concerning the sheriff's office.)

The court agrees that there is no issue of material fact that deputies Tanya Rodriguez and Felix Rodriguez did not make final policy for the Sheriff's office. Accordingly, the Sheriff is entitled to summary judgment on the ratification claim as well.

## IV.    RECOMMENDATION

For the reasons discussed above, I respectfully recommend that the motions for summary judgment filed on behalf of Tanya Rodriguez (formerly "Rightsell") and Felix Rodriguez (Doc. 37) and on behalf of Sheriff Chris Blair (Doc. 47) be **GRANTED** in all respects. I also recommend that the motion for partial summary judgment filed on behalf of Plaintiffs (Doc. 31) be **DENIED**.

Recommended in Ocala, Florida on August 10, 2017.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy